FILED'05 MAY 05 10:17USDC·ORP

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

UNITED STATES OF AMERICA,

        Plaintiff,

    v.

CLEVELAND DANTE NELSON III,

        Defendant.

CR-04-417-RE

OPINION AND ORDER

KARIN J. IMERGUT
United States Attorney
FREDRIC N. WEINHOUSE
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, OR 97204-2902

        Attorneys for Plaintiff

STEPHEN R. SADY
Chief Deputy Federal Defender
101 SW Main Street, Suite 1700
Portland, OR 97204

        Attorney for Defendant

PAGE 1 - OPINION AND ORDER

REDDEN, Judge:

The matter before the court is defendant's motion to suppress statements he allegedly made following his July 13, 2004, arrest for being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). Oral arguments were held on March 4 and 7, 2005. Thereafter, the court allowed supplemental briefing from both parties.

**Motion to Suppress Statements – Fruit of the Poisonous Tree[1]**

Defendant argues the statements he allegedly made to police after his July 13, 2004, arrest must be suppressed because they were the result of (a) an illegal stop and pat-down search that occurred on June 21st, and (b) an arrest on July 13, 2004, without legally sufficient probable cause. Thus, this court must first determine the legality of the June 21st stop and pat-down search and the July 13th arrest.

**A.      Background.**

On June 21, 2004, at around 6:30 p.m., Portland Police Bureau Officer James Stradley was on routine car patrol in Alberta Park, Portland, Oregon. Officer Stradley testified he was aware of recent sales of crack cocaine in Alberta Park and had, in the past, had personal contact with gang members of the Woodland Park Bloods in Alberta Park. While patrolling the park, Officer Stradley and his partner, Officer Mike Chapin, noticed defendant near the tennis court area, wearing what Officer Stradley described as a "heavy jean jacket." Officer Stradley testified

---

[1] The "fruit of the poisonous tree" doctrine generally prohibits the admission at trial of evidence, both physical and verbal, that is derived from illegal government acts. Brown v. Illinois, 422 U.S. 590, 598 (1975) (citing Wong Sun v. United States, 371 U.S. 471, 484-88 (1963)).

PAGE 2  -  OPINION AND ORDER

that he suspected defendant might be hiding a gun in his jacket because it was too warm (more than 90 degrees) to be wearing a heavy jacket.

According to Officer Stradley, when he drove his police car into the park, defendant, who had been watching the police, quickly walked in a straight line toward the restroom building and out of Officer Stradley's view for a fraction of a second. Defendant then made a 90-degree turn toward a covered basketball court area, where Officer Stradley approached him. Officer Stradley testified that defendant "looked tremendously nervous," which gave Officer Stradley further reason to suspect defendant was carrying a weapon. Officer Stradley and his partner then grabbed defendant's arms and patted him down for weapons. No weapons were found on his person.

Officer Stradley testified that defendant said his name was Darrell Harris, which Officer Stradley knew to be false because he knew the real Darrell Harris. Believing he lacked probable cause to detain defendant further, Officer Stradley allowed defendant to walk away. Thereafter, Officer Stradley immediately began retracing defendant's path toward the restroom building. According to Officer Stradley, as soon as defendant saw where Officer Stradley was headed, defendant took off at a "dead run" southbound out of the park.

Officer Stradley found a large Smith & Wesson target pistol laying on the ground alongside the restroom building. He picked up the gun, went back to his police car and lodged it barrel-down between the seats of the car. Officer Stradley immediately tried to find defendant but was not able to apprehend him that evening.

Officer Stradley testified he "bagged and processed" the gun after giving up his search for defendant. No fingerprints were found on the gun, and no attempt was made to secure DNA

from the gun. Officer Stradley testified that, after patting down defendant, he was confident he would be able to identify him if he ever saw him again.

On July 13, 2004, Officer Stradley once again was patrolling Alberta Park, this time with Officer Robert King, when he saw a group of men, many of whom he recognized, sitting around a picnic table. He testified he recognized defendant among the men, approached him, and arrested him for the possession of a concealed firearm on June 21st.

**B.  Legal Standards.**

**1.  Legal Standards.**

The Fourth Amendment to the United States Constitution provides protections and mandates certain requirements for the government's search and seizure of a person. Davis v. Mississippi, 394 U.S. 721 (1969). These protections include the prohibition of unreasonable searches and seizures, including those made during brief investigatory stops of persons or vehicles that fall short of traditional arrest. United States v. Arvizu, 534 U.S. 266, 272 (2002); citing Terry v. Ohio, 392 U.S. 1, 9 (1968); United States v. Cortez, 449 U.S. 411, 417 (1981).

The Fourth Amendment is satisfied when the action of an officer who conducts an investigation is supported by reasonable suspicion to believe that criminal activity may be afoot. Arvizu, 534 U.S. at 272. "Reasonable suspicion" is established by showing that the officer relied upon specific and articulable facts supporting an inference that some criminal activity was occurring, and the detained individual had been involved in such activity. Terry, 392 U.S. at 18-19; Florida v. Royer, 460 U.S. 491, 500 (1983); Brown v. Texas, 443 U.S. 47, 51 (1979); see also United States v. Lopez-Soto, 205 F.3d 1101, 1105 (9th Cir. 2000) (reasonable suspicion is created by specific, articulable facts that, when considered together with objective and reasonable

inferences, establish a basis for suspecting that the particular person detained is engaged in criminal activity).

Courts must look at the "totality of the circumstances" of each case to see whether the detaining officer has a "particularized and objective basis" for suspecting legal wrongdoing. Id. "An officer is entitled to rely on his training and experience in drawing inferences from the facts he observes, but those inferences must also be grounded in objective facts and be capable of rational explanation." United States v. Lopez-Soto, 205 F.3d at 1105. In Terry v. Ohio, the Supreme Court noted:

> [I]n justifying the particular intrusion the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion . . . . [A] judge . . . must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances. And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?

Terry, 392 U.S. at 21-22 (footnotes omitted).

Officers making such factual determinations are not required to be always correct, but must "always be reasonable." Illinois v. Rodriguez, 497 U.S. 177, 185 (1990). Where insufficient objective basis for the stop exist, the product of the stop must be suppressed. United States v. Salinas, 940 F.2d 392, 394 (9th Cir. 1991).

## 2.  **Discussion.**

Defendant argues reasonable suspicion was lacking when the officers stopped him and conducted a pat-down search in Alberta Park on June 21st. Therefore, he asserts, any statements he made after his July 13th arrest, which was based largely on the June 21st encounter with police,

were the result of an illegal search and seizure and must be suppressed under the "fruit of the poisonous tree" doctrine. <u>Brown v. Illinois</u>, 422 U.S. at 598 (citing <u>Wong Sun v. United States</u>, 371 U.S. at 484-88).

Specifically, defendant contends reasonable suspicion was lacking because: (1) his race is not a proper reason to suspect him; (2) his fashion choice to wear a denim jacket on a summer evening is not suspicious; (3) the "fraction of a second" he was out of Officer Stradley's view was not sufficient time to dispose of a gun; and (5) the stop generated defendant's nervousness, but his nervousness cannot be used to justify the stop.

This court disagrees with defendant. The June 21st stop of defendant was legal, and was justified by Officer Stradley's reasonable suspicion that defendant had committed or was about to commit a crime, given the circumstances then existing. Officer Stradley was permitted to rely not only on the "totality of the circumstances" in forming a "particularized and objective basis" for suspecting legal wrongdoing, but also to "draw on [his] own experience and specialized training to make inferences from and deductions about the cumulative information available to [him] . . . ." <u>United States v. Arvizu</u>, 534 U.S. at 272. Officer Stradley gave credible testimony about specific and articulable factors that supported his suspicion that defendant may have been carrying a firearm, including that: (a) defendant caught Officer Stradley's attention because he was wearing what Officer Stradley described as a "heavy" jean jacket on a hot summer day; (b) Alberta Park, the location of the stop, was known to Officer Stradley as an area involving gang and drug-related crime; (c) defendant watched police intently when the officers drove toward defendant and thereafter pursued what Officer Stradley thought to be an "illogical path of travel," walking in a straight line to the restroom building, and then turning 90-degrees and

walking towards a basketball court area; and (d) defendant "looked tremendously nervous" when officers approached him in the basketball court area, before they stopped him.

As to the pat-down search, Officer Stradley was not required to be absolutely certain defendant was armed, which would be a risk to officers or public safety. The test is whether a reasonably prudent person in the circumstances would be warranted in a belief that his safety or the safety of others might be at risk. Terry, 392 U.S. at 27. In this case, Officer Stradley was concerned defendant might be carrying a firearm, based on the specific and articulable facts to which he testified. Thus, the pat-down search conducted after the stop was justified by officer and public safety concerns.

The court also rejects defendant's argument that Officer Stradley had a racial basis for stopping defendant. There is no credible evidence or legal authority that would permit a conclusion of racial bias based on Officer Stradley's testimony that one of the reasons he drove into Alberta Park was because "gang member types" (*i.e.*, young African American men belonging to the Woodlawn Park Bloods) were in the area.

This court concludes that, given the circumstances then existing, the June 21st stop and pat-down search of defendant complied with Fourth Amendment requirements.

C.  **July 13th Arrest.**

1.  **Legal Standards.**

The government bears the burden of establishing that probable cause supported a warrantless arrest. United States v. Hernandez, 322 F.3d 592, 596 (9th Cir. 2003); United States v. Valencia, 24 F.3d 1106, 1108 (9th Cir. 1994). "Probable cause" requires facts and

circumstances within the officer's knowledge to warrant a prudent person in believing a suspect has committed, is committing, or is about to commit a crime. <u>Valencia</u>, 24 F.3d at 1108.

## 2.  Discussion.

Defendant argues his arrest on July 13, 2004, was not supported by probable cause. He asserts the government's claim of probable cause depends largely on Officer Stradley's observations from the June 21st encounter with defendant which, as discussed above, defendant argues did not even constitute reasonable suspicion. Defendant argues any additional facts existing on July 13th may have provided a basis for a further inquiry, but were not sufficient to establish probable cause.

As discussed above, this court has rejected defendant's argument that the June 21st stop was not supported by reasonable suspicion. Thus, the court accepts the government's factoring into the probable cause analysis Officer Stradley's observations on June 21st.

The government also points to the following additional factors that support its argument there was sufficient probable cause:  (a) during the June 21st stop, defendant gave officers a false name and then sprinted out of the park when he saw officers headed toward the restroom building; (b) the firearm was found at the only spot where Officer Stradley lost sight of defendant for a fraction of a second; (c) the firearm was in pristine condition and appeared to have just been freshly placed alongside the restroom; (d) when the officers encountered defendant on July 13th, the real Darrell Harris was part of defendant's group, as was a man named Trey (the name of the person defendant allegedly purchased the gun from); and (e) defendant was the only one among the group at the picnic table who looked in the opposite direction of the police car.  Further,

Officer Stradley testified he recognized defendant as being among the group of men he saw in Alberta Park on July 13th.

The court accepts the government's argument that the facts and circumstances mentioned above, which were within Officer Stradley's knowledge and derived both from the June 21st stop and July 13th encounter, would warrant a prudent person in believing defendant had committed, was committing, or was about to commit a crime. Therefore, the court concludes that Officer Stradley had probable cause to arrest defendant on July 13th.

**D.    Conclusion.**

Because this court concludes the June 21st stop and pat-down search and July 13th arrest were legal, defendant's motion to suppress his statements on the basis of the "fruit of the poisonous tree" doctrine is DENIED.

### Motion to Suppress for Failure to Honor Invocation of Rights and for Improper Inducement

Defendant moves to suppress the statements the government alleges he made[2] on July 13th on two bases:

(1)  Defendant contends the statements must be suppressed because the officers failed to "scrupulously honor" his invocation of silence and his invocation of the right to an attorney.

(2)  Defendant contends the statements were involuntary because they were improperly induced either by (a) a direct promise from Officer Stradley that the defendant would be released if he was honest about the firearm charge; or (b) an offer by Officer Stradley to let him discuss

---

[2]  At the hearing, defendant testified he never made any inculpatory statements.

the possibility of cooperation and leniency with the homicide detective only if defendant was honest about the firearm charge.

## A.    Legal Standards.

The procedural protections afforded by Miranda are designed to safeguard an accused's privilege against self-incrimination.  The defendant must be told that he has the right to remain silent, that any statement he makes may be used as evidence against him, that he has the right to the presence of an attorney, either retained or appointed.  Miranda v. Arizona, 384 U.S. 436, 444 (1966).  Statements made by a defendant during custodial interrogation may only be admitted into evidence if defendant voluntarily, knowingly, and intelligently waives his Miranda rights. Id.  The government bears the burden of proving valid waiver of Miranda rights.  Tague v. Louisiana, 444 U.S. 469 (1980).  The failure to respect an invocation of silence requires case-by-case analysis under Michigan v. Mosely.  423 U.S. 96, 104 (1975).  Additional safeguards are necessary when the accused asks for counsel.  Arizona v. Edwards.  451 U.S. 477, 484-85 (1981).  Once an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation.  Id.  Rather, the government must show that the accused himself initiated further "communication, exchanges, or conversations with the police."  Id.

A valid Miranda waiver depends on the "totality of the circumstances, including the background, experience, and conduct of the defendant."  United States v. Garibay, 143 F.3d 536 (9th Cir. 1998) quoting United States v. Bernard S., 795 F.2d 749, 751 (9th Cir. 1986).  A voluntary statement is the product of a rational intellect and a free will.  Blackburn v. United

States, 361 U.S. 199 (1960). When considering whether a confession is voluntary, "[t]he test is whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." United States v. Leon Guerrero, 847 F.2d 1363, 1365 (9th Cir. 1988). An inducement only vitiates consent if it is "sufficiently compelling to overbear the suspect's will in light of all attendant circumstances." Id. at 1366. Thus, "[a]s long as the decision is a product of the suspect's own balancing of competing considerations, the confession is voluntary." United States v. Miller, 984 F.2d 1028, 1031 (9th Cir. 1993). The government bears the burden of demonstrating the voluntariness of the confession by a preponderance of the evidence. Colorado v. Connelly, 479 U.S. 157, 167 (1986). Any doubts regarding the waiver of a constitutional right must be resolved in favor of no waiver. Michigan v. Jackson, 475 U.S. 635, 633 (1986).

**B.** **Arguments and Hearing Testimony.**

**1. Officers' Testimony.**

Officer Stradley testified he did not remember precisely when he first gave defendant his Miranda warnings, but he thought it was probably while defendant was sitting, handcuffed, in the back seat of the police car. The court notes that Officer King testified defendant was not advised of his rights at the scene of the arrest or in the police car, but only at the precinct. Officer Stradley said he remembered that defendant indicated that he understood his rights, but denied knowing of the June 21st encounter. Officer Stradley testified that defendant never asked for a lawyer while in the police car.

Officer Stradley testified that upon arriving at the precinct he put defendant in a holding cell and contacted defendant's parole officer, Officer Green, to obtain a detainer. Officer Green

agreed defendant should be detained. Officer Stradley then took defendant to an interview room, where he asked defendant to read aloud his <u>Miranda</u> rights and sign the printed card. Officer King testified this was the first time <u>Miranda</u> warnings were given to defendant.

Officer Stradley testified to the following sequence of events after defendant signed the waiver:

(1) Defendant repeatedly asked how he could help himself and expressed a strong desire not to remain in custody. Both Officers Stradley and King testified that Officer Stradley never told defendant he would be released if he were honest. Rather, Officer Stradley testified he told defendant he was going to jail. Officer Stradley testified there was no discussion about releasing defendant until after defendant had talked to homicide Detective Grose, and Detective Grose asked Officer Stradley to release defendant.

(2) Both Officers Stradley and King testified that defendant suggested he may have helpful information about a homicide. Officer Stradley told defendant he was not interested in talking about any other cases until defendant was honest about the incident on June 21st. Officer King testified: "Well, it was at some point in our contact, Officer Stradley had asked if he had previous knowledge of a gang homicide, and it was in the course of the interview that he had said – Officer Stradley had said 'Prior to being able to talk to you about any other matter or having a discussion about anything else, you need to be honest with me about this gun charge.'"

(3) Defendant then gave a detailed statement about the June 21st event. He explained he had purchased the gun from a man named Trey for protection after his release from prison in May, he paid $115 for it, and Trey told him the gun was operable, though defendant had not test-fired it.

PAGE 12 - OPINION AND ORDER

(4) After defendant's confession, Officer Stradley asked him a few questions about the homicide in order to identify the homicide detective assigned to the case. He testified he told defendant that he was being charged with the firearm crime and if he made a deal with a homicide detective, "that would be fine with me, but that wasn't the deal he was making with me." Officer Stradley then contacted homicide Detective Brian Grose, at approximately 7 p.m. that evening by Detective Grose's estimate. Officer Stradley told Detective Grose that defendant had confessed to a firearm charge, and asked him to come to the precinct. Officer Stradley testified Detective Grose came to the precinct and talked to defendant around 8 p.m. that evening.

Both Officer Stradley and Detective Grose testified that after Detective Grose's interview with defendant, Detective Grose told Officer Stradley defendant had firsthand knowledge about the homicide and he was willing to cooperate. Officer Stradley testified Detective Grose asked that defendant be released with a citation because "he's willing to make some phone calls for us." Officer Stradley testified he told Detective Grose he would have to contact defendant's parole office because he had already obtained a detainer.

Parole Officer Green testified that he received the first request for a detainer from Officer Stradley between 4 and 5 p.m. on July 13, 2004, though he was not sure of the exact time. Officer Green testified that he believed Officer Stradley called the second time at or before 6:15 p.m. asking to lift the detainer. Although Officer Green did not make contemporaneous notes of the calls, he testified that he remembered about an hour elapsed between phone calls because he was outside a woman's house preparing to make an arrest, and the sun was uncomfortably warm. But by the time the second call came "[he] was cool and in a place where [he] could talk freely,

and...the sun wasn't bothering [him] any more [sic]." Officer Green also testified that the "chrono" for the arrest indicated that the arrest took place at 6:15 p.m., and he is sure the second phone call came before the arrest.

## 2. **Defendant's Testimony**.

Defendant's testimony contradicts the testimonies of Officers Stradley and King, and Detective Grose. Defendant testified Officer Stradley did not give him <u>Miranda</u> warnings in the police car, but simply said, "We'll talk about it at the precinct," and "You don't have to talk to me." Defendant testified that while he was in the back seat of the police car, he told Officer Stradley he did not want to talk and he wanted a lawyer. Defendant was asked no questions about the incident, and did not make any incriminating statements in the police car. Thus, defendant contends he invoked his <u>Miranda</u> rights in the police car.

Defendant testified to the following events when he reached the precinct:

(a) At the precinct, he was not given the <u>Miranda</u> rights card until late in the interview, just before Officer Stradley left to call Detective Grose.

(b) Officer Stradley came to the holding cell and stated that if defendant would talk to him, "I'll see what I can do to release you." Defendant testified he said he would talk, but Officer Stradley would not like what he would hear. Defendant says that after he denied culpability, Officer Stradley indicated the case could go away if defendant had useful information, and then he mentioned the name of a relative of defendant who was murdered. Defendant says with the understanding he would be let go, he agreed to talk even though he had been in prison at the time of the homicide. Officer Stradley then left to call the homicide detective. Defendant testified

Officer Stradley brought up the homicide investigation first, and that he made it very clear to Officer Stradley he had no information whatsoever about the homicide.

(c)   At the precinct, defendant was subject to improper inducement of a confession (which he also testified he never made). He says the alleged confession was completely fabricated by Officer Stradley, with the cooperation of Officer King and Detective Grose.

(d)   He initially told Officer Stradley he did not want to talk to him, but then agreed to talk because Officer Stradley promised to release him just for talking without providing any information or confession. Defendant testified "I asked him, I said, All you want me to do is talk to you? I said, It doesn't have to be nothing pertaining to what, you know, you want to hear or nothing, you just want me to talk to you. He then told me, he said, Yeah, I just want you to talk to me and I'll release you. I said, Okay, I'll talk to you."

Defendant testified that when Detective Grose arrived, the detective told him about the murder and the two people he thought had committed it. According to defendant, Detective Grose told him that he needed someone to testify against the two suspects in the homicide. Defendant testified that he told Detective Grose, just as he had told Officer Stradley, he knew nothing about the homicide because he was in jail when it happened. Nevertheless, defendant says Detective Grose gave him a telephone number and asked him to call if he heard anything. Defendant testified that he was released from custody about 30 minutes after his interview with Detective Grose ended, or around 11 p.m. by defendant's estimate.

On its face, the police report can be read to support defendant's argument that Officer Stradley offered release in exchange for a confession on the firearm charge. The police report states, in relevant part:

Prior to our interview [defendant] asked me if he would be let go tonight if he was honest. I at first told him that I did not know and would have to talk to his P.O. because I had already requested a detainer. I re-contacted the P.O. Carl Green and asked him how he felt about me citing [defendant]. Carl Green told me that would be fine and to tell [defendant] to be in the P.O.'s office tomorrow morning at 1000 hours.

I talked with [defendant] and <u>told him that if he told the truth I would release him tonight with a citation</u>. I told him that it was important that he understand that in no way was I telling him he would not be charged with a crime. I told him that being released with a citation was an arrest but since his mug was already on file I could release him. <u>At this point [defendant] signed the rights form</u> with Officer King and I as witnesses and gave a full statement noted in this report.

Def. Exh. 121 (emphasis added).

The report makes no mention of Detective Grose or his homicide investigation. Officer Stradley testified that he omitted this information to protect Detective Grose's investigation and the defendant. Thus, he admitted in his testimony that the police report is inaccurate and incomplete. He explained that in omitting any mention of the interrogation that dealt with a homicide investigation being conducted by Detective Grose, he inadvertently confused and poorly characterized the sequence of the events following defendant's arrest. He testified he made no promises to defendant in exchange for his confession.

**C.** **Discussion**.

The evidence and testimony relating to the substance and sequence of events in this case are confusing and contradictory. Substantial conflicts exist among the accounts given by both Officers Stradley and King and Detective Grose, on the one side, and defendant, Parole Officer Green, and the police report, on the other side. There are also serious problems with defendant's credibility.

In his first argument, defendant contends the officers failed to scrupulously honor his invocation of his rights to silence and to counsel by continuing to interrogate him after he invoked these rights. The testimonies of Officer Stradley and defendant conflict with respect to when defendant was given Miranda warnings, and whether he invoked his rights to silence and to counsel. Although defendant disputes he was given Miranda warnings in the patrol car, he also asserts he invoked his rights to silence and to counsel in the patrol car and those invocations should have carried forward, undisturbed, throughout the interrogation.

There is no dispute that defendant was at least given Miranda warnings at the precinct, however there is a depute as to when he received them. The police report supports defendant's contention that he was not presented with a standard rights card until well into the interrogation, before "confessing." Officer's Stradley and King testified that defendant read aloud and signed a standard rights card when he first entered the interrogation room at the precinct.

This court concludes that even if defendant did invoke his right to counsel, he did not invoke his right to silence because by his own admission defendant initiated further contact with officers at the precinct by asking what he could do to "help himself." Defendant's self-initiation of further conversation with officers amounted to a waiver of his previous invocation of his right to have counsel present during interrogation. See Arizona v. Edwards. 451 U.S. 477, 484-85 (1981). The court further concludes that defendant did sign the standard rights card waiving his Miranda rights, after he had verbally waived them. Therefore, defendant's motion to suppress for failure to honor his invocation of rights is DENIED.

In his second argument, defendant asserts Officer Stradley induced his confession by (1) offering to release him that night if he admitted to the firearm possession, and/or (2) by offering

PAGE 17 - OPINION AND ORDER

to allow defendant to speak to a homicide detective if he first "told the truth" about possessing the firearm. The latter theory is premised on an unspoken understanding between Officer Stradley and defendant that allowing defendant to speak to a homicide detective was likely to result in leniency if defendant cooperated with a homicide investigation.

Defendant argues that a voluntary confession is one not obtained by any direct or implied promises, however slight. Bram v. United States, 168 U.S. 532 (1897). Defendant argues that even a mild promise of leniency is sufficient to bar the confession, not because the promise is an illegal act as such, but because defendants at such times are too sensitive to inducement and the possible impact on them too great to ignore and too difficult to assess. Brady v. United States, 397 U.S. 742, 754 (1970).

Under both theories, defendant asks the court to believe that Officer Stradley promised to release defendant and/or to put him in touch with the homicide detective (and then ultimately did release him) even though, as defendant testified, he denied possessing the firearm, and denied having any useful information about the homicide. The court finds defendant's testimony in this regard less than fully credible. Further, defendant's assertion in his motion that his confession was illegally obtained is inapposite to his testimony that he made no confession at all.

The sequence of events depicted in the police report is of great significance in this case. It directly supports defendant's contention that Officer Stradley promised to release defendant before defendant confessed to possessing the firearm. Although Officer's Stradley and King, and Detective Grose, offered a plausible explanation for why that depiction is inaccurate, Parole Officer Green's testimony suggests the police report is not as inaccurate as the government would have the court believe. Officer Green testified that about and hour or so after Officer Stradley

PAGE 18 - OPINION AND ORDER

requested a detainer (between 4 and 5 p.m.) he called back asking to lift it. Officer Green was certain the second call came before 6:15 p.m., because the arrest he made shortly after the second call was documented as having occurred at 6:15 p.m.. Thus, by Officer Green's account, Officer Stradley asked for permission to lift the detainer more than 45 minutes before contacting homicide Detective Grose (at approximately 7 p.m.), and more than 2.5 hours before Detective Grose completed his interview with defendant (around 8:45 p.m.). The government did not attempt to explain this large discrepancy in timing. Officer Stradley simply testified that after Detective Grose asked to release defendant, he contacted Officer Green and wrote out a citation. Officer Stradley estimated this process took place between 9:30 and 10 p.m.

Significantly, Detective Grose's testimony, while corroborative of Officer Stradley's as it relates to defendant's cooperation with the homicide investigation, is not necessarily inconsistent with the inference from Officer Green's statements that Officer Stradley was prepared to release defendant as early as 6:15 p.m. Officer Stradley could have promised defendant he would release him and/or permit him to speak to a homicide detective (and then release him), if he admitted to possessing the firearm, just before 6 p.m.. Officer Stradley could have then called Officer Green to ask that the detainer be lifted (around 6:15 p.m.), and then called Detective Grose at 7 p.m. to see if he was available to speak to defendant about the homicide investigation. Detective Grose may well have endorsed releasing defendant after the homicide interview ended around 8:45 p.m. However, under this hypothetical, Officer Stradley may have planned to release defendant anyway, based on his confession to the firearm charge. Alternatively, Officer Stradley may have double-checked with Officer Green to see if he would be willing to lift the detainer before calling Detective Grose, with the understanding that Detective Grose wouldn't want to be bothered after

hours if he didn't have clearance to "cut a deal" with defendant during the interview. Even if the latter were true, it suggests Officer Stradley's plan to use access to the homicide detective as a carrot, to induce defendant to confess to the firearm charge.

Either way, the court concludes that Officer Stradley did not obtain a knowing and voluntary confession from defendant, but improperly induced defendant's confession through a direct or implied promise of leniency. Accordingly, the court concludes that the government has not met its burden of proving that defendant's confession to possession of the firearm was obtained free of improper inducement, by a preponderance of the evidence. Instead, the evidence strongly suggests defendant admitted to possessing the firearm as a condition of release, or as a prerequisite to "helping himself" by providing the homicide detective with information.

Therefore, defendant's motion to suppress based on his argument that his confession was illegally induced is GRANTED.

### Motion to Dismiss Indictment or Suppress Evidence as a Sanction

Defendant argues the indictment should be dismissed, or his confession suppressed, as a sanction for Officer Stradley's falsified police report. Defendant contends government misconduct has "placed in jeopardy the integrity of the criminal justice system," citing United States v. Samango, 607 F.2d 877, 882 (9th Cir. 1979) (court dismissed indictment after concluding that grand jury was "overreached" by "cumulative effect" of prosecutor's deliberate introduction of highly prejudicial testimony that served no probative value). Defendant argues that even though courts are usually reluctant to dismiss indictments because of the constitutionally-based independence of the prosecutor and the grand jury, deference is not

merited here because the prosecutor and the grand jury's decisions were premised on a falsified police report.

This court concludes although the police report was inaccurate and incomplete, the evidence does not support a claim that Officer Stradley intentionally falsified the report in violation of law or committed the crime of tampering with public records. Officer Stradley gave credible testimony about the reasons the report was inaccurate and incomplete. The evidence supports a conclusion that the report was written in a fashion not to reveal defendant's cooperation in the homicide investigation and that was at the least a contributing factor to its inaccuracy and incompleteness. Officer Stradley had lawful authority and discretion to omit a fact from a police report in order to protect the safety of a cooperating defendant. Officer Stradley's inaccurate and incomplete report, as explained by him in his testimony, does not rise to the level of placing "in jeopardy the integrity of the criminal justice system."

Finally, defendant argues his statements should be suppressed as a sanction for government's violation of the discovery and disclosure requirements of Fed. R. Crim. P. 16. This court concludes no Rule 16 violation occurred in this case. Officer Stradley's action should not be construed as a failure to disclose probative or prejudicial information to defendant. The evidence supports the government's statement that the inaccuracies in the police report were revealed to defendant as soon as the government became aware of them, and does not support a conclusion there was any collusion on the part of the government to mislead the defense.

Therefore, this court denies defendant's motion to dismiss the indictment or suppress his statements as a sanction for an inaccurate and incomplete police report filed by Officer Stradley.

## Conclusion

For the reasons discussed above, defendant's motion to suppress statements (#17) is

GRANTED.

IT IS SO ORDERED.

Dated this ___5th___ day of May, 2005.

James A. Redden
United States District Judge